## Will Baugus v. The State.

### No. 5710.　Decided June 25, 1920.

Murder—Strychnine Poison—Exculpatory Statement—Confession—Insufficiency of the Evidence—Conspiracy.

> Where upon trial of murder by causing the deceased to drink whisky containing strychnine poison, the evidence was wholly circumstantial, and not sufficient to establish a conspiracy claimed by the State between defendant and others, and in view of the defendant's exculpatory statement in his alleged confession, the evidence was insufficient to sustain the conviction, there is reversible error. Following Pratt v. State, 56 Texas Crim. Rep., and other cases.

Appeal from the District Court of Ellis. Tried below before the Honorable F. L. Hawkins.

Appeal from a conviction for murder; penalty, twelve years imprisonment in the penitentiary.

The opinion states the case.

*Will Hancock* and *Tom Whipple,* for appellant.

*Alvin M. Owsley,* Assistant Attorney General, for the State.

MORROW, JUDGE.—The charge against the appellant is that he murdered .West Tune by causing him to drink whisky containing strychnine poison. The evidence was wholly circumstantial, and was so treated by the court. The State advanced the theory that in the commission of the offense the appellant acted with one or both of his brothers, Don and Ed Baugus, and the court instructed the jury in separate paragraphs upon the theory of principals and of conspirators. The appellant urged timely objection to the charge on conspiracy, claiming that it was an issue not raised by the evidence, and he also insists that the evidence is not sufficient to sustain the conviction.

The deceased was a man approximately fifty years of age. Some thirteen years before his death he was convicted of murder of a child, and about seven years later had been released from the penitentiary upon pardon, and had returned to his old place of residence, where he resided with his wife and family until the death of his wife and daughter, when he rented his home, reserving a room, he and his son boarding with the tenant, Mr. Wade. He died of strychnine poison on the morning of the 29th of September. On Sunday, which was the day of his death, soon after eating a hearty meal at his home, he stated that he was going to meet a couple of fellows on the creek and go and look at his shiloh cotton; that he was to meet them about 2 o'clock. He returned about 4 o'clock, and soon thereafter went to his room and called upon one of the inmates of the house to secure a doctor, stating that he was sick. The messenger who went for the doctor failed to find him, but while at the drug store making inquiry for the doctor he saw appellant's brother, Ed Baugus. and the two returned and found Tune sitting on his bed, complaining. While in the room deceased said to Ed Baugus, "Ed, you go and ask the women folks what was in that bottle we drank out of a while ago. They will know." Ed made no reply, but turned and went off. Ed Baugus immediately went to his mother's, and caused his brother, Don Baugus, and the appellant, Will Baugus, to be notified of the condition of deceased, and that he had made a statement to the effect that "he had taken a couple of drinks with the Baugus boys down on the creek," which might have something to do with his illness. They, upon receipt of the notice, immediately came to the home of the deceased, and entered his room, but he was suffering and no conversation took place with them.

The deceased made statements to various parties, in substance that he took two drinks of whisky with the Baugus boys; that they claimed that it was whisky they had had for some time; that the whisky tasted bitter; that it could not have been the whisky that

was causing his trouble, as Will Baugus had drank out of the same bottle and it didn't affect him; and that he, the deceased, had had spells of this kind before. Later he said that the whisky was the trouble, and thought he was poisoned. The written statement of the appellant, made to the county attorney a few days after the death of deceased was introduced in evidence, and is as follows:

"I knew West Tune. On last Sunday about 8 o'clock in the morning I saw West Tune. He was with Ed Brown and my brother Ed Baugus; I met them at the little bridge; we all went down the road together except Ed Brown, he went on to my home. Ed Baugus, West Tune and I went down road together, until I turned off up the creek to get water and West Tune and brother Ed Baugus went on the road towards Ovilla. I did not see West Tune any more that day until late in the evening about 5 o'clock. Ed Baugus came to my house and said that West Tune was dying and wanted us to come down there. I went to West Tune's home. I stayed there about 30 minutes. I did not have any whisky and have not had or bought any whisky in over a year. I have not had or seen any strychnine in the past ten years. I was in Cedar Hill last Saturday. I went to Bass Switzer about buying a house and we stayed there all day. I did not go into a drug store there that day. I did not see any one buy or have strychnine that day, before or since. When I went to West Tune's home Sunday I did not speak to him and he did not speak to me. I saw Ed Brown at West Tune's home Sunday evening when I was there. I don't know of any person having any strychnine during year. I have not heard of any dogs being poisoned."

The State's theory was that the deceased drank the whisky while in Red Oak Creek, and that Don and Ed Baugus and the appellant were present. Evidence was introduced to the effect that Ed Baugus was seen in company with the deceased about half past 2 o'clock on the day that the offense is charged to have been committed, and that at the time they were walking up Red Oak Creek. Testimony was also introduced to the effect that the appellant was seen about half past 2 o'clock at a certain place on the creek called Ford crossing. Don and Ed Baugus were indicted, but the case against Don was dismissed. The mother of the appellant lived near Red Oak Creek and we understand from the statement of facts that appellant and his five brothers lived in the same vicinity with their families, and that one of the brothers had a son also living there, about seventeen years of age. There was evidence that about two months before the death of Tune appellent was in possession of some strychnine, and stated that he was going to kill dogs who were killing his turkeys. The appellant testified to an *alibi*, and introduced a number of witnesses supporting him, that is to say, he disclaimed having seen the deceased since the early morning of the day upon which the poisoned whisky is supposed to have been drunk; claimed to have had no

whisky nor strychnine, and that at noon there was company at his house and he remained there during the aftrenoon until he was notified of Tune's illness at about 5 o'clock.

The statement in the nature of a confession made by the appellant in the presence of the county attorney soon after the death of the deceased contains many exculpatory statements. From the confession it appears that the appellant had no whisky; that he had no strychnine; that he did not see the deceased after 8 o'clock on the morning of the day of the homicide; that he knew of no other having strychnine. The charge of the court on conspiracy was an accurate and comprehensive one in our judgment, and its effect was to inform the jury that to establish a conspiracy there must be circumstantial evidence proving a positive agreement to kill the deceased in the manner charged. We entertain great respect for the learning and wisdom of the judge who presided in the trial of this case, but are constrained to the conclusion that the record is bare of evidence upon which the jury might predicate a conclusion that appellant and his brother entered into a conspiracy to poison the deceased. There are some declarations of Ed and Don Baugus which were before the jury, and which, of course, would not be sufficient to establish conspiracy. The court correctly informed the jury of this, but told them in substance that if a conspiracy existed these declarations might be considered against the appellant. In passing, we will say that the declarations, we think, add but little if any to the cogency of the evidence supporting the theory of conspiracy. In our search of the record we have been unable to reach the conclusion that there are circumstances proved beyond a reasonable doubt from which the inference of conspiracy could be drawn, to the exclusion of any other reasonable hypothesis arising from the evidene. There was no motive for the crime shown. The deceased carried money on his person, and often boasted of it, and had $500 in his pocket at the time, but there is no intimation supported by the evidence pointing to a desire to rob him. There was no relationship or circumstances indicating that the appellant or his brothers would profit by the crime. The theory of conspiracy is inconsistent with the confession as a whole, and is directly opposed to several of the definite statements therein made, which statements the State has introduced in evidence and having introduced them, assumes the burden of disproving them if they are obstacles to conviction. Pharr v. State, 7 Texas Crim. App., 442; Pratt v. State, 50 Texas Crim. Rep., 227. This rule is not of universal application, but the facts before us, we think, on the issue which we are now considering bring it into operation. Pickens v. State, 86 Texas Crim. Rep., 657, 218 S. W. Rep., 756. It is through the confession alone that the State is able to prove that the deceased had been seen by the appellant on the day of the homicide prior to the offense, and that on that day Ed Baugus and appellant were in the company of deceased. Relying

upon these statements of the appellant, those accompanying them are binding upon the State, unless disproved. The medical testimony is to the effect that the quantity of strychnine found in the deceased was small, though sufficient to produce death. One of the circumstances relied upon to disprove the declaration of the appellant in his confession that he had no strychnine is the testimony of a boy to the effect that two months before he had been told by the appellant that a neighbor's dogs had been killing his turkeys, and that he had some strychnine which he intended to use to poison the dogs, and that he showed the witness a liquid, the color of water, the quantity of which was not stated, and which the witness had no means of identifying as strychnine poison. The deceased took a couple of drinks in the bed of the creek with the Baugus boys. Of these there were six. Those present are not named, other than to state that Will Baugus, the appellant, drank some of the whisky. Whether Will Baugus furnished the liquor, or was invited with the deceased to drink, and if so, by whom, is a matter of inference only. Appellant was seen on the creek, but not in company with the deceased, nor with any of the Baugus boys, not at the place, as we understand the testimony, shown to be near in point of time or place to the point at which the deceased was seen in company with Ed Baugus. Granting that the declarations of the deceased and the other surrounding circumstances are sufficient to show that the appellant was present, and that either Don or Ed Baugus was also present when the deceased drank the whisky, and that it was through the whisky that he received the poison, the guilty knowledge of the appellant would be a question for the jury. The theories of accident or mistake arising from the evidence would require consideration. The liquid, it seems, from the statements of the deceased, was transferred from some container to a bottle, out of which both the deceased and the appellant drank. These elements upon which the jury might have entertained a reasonable doubt would be eliminated, if in advance the appellant had entered into an agreement to poison the deceased. The implication, by submitting the matter to the jury, that in the opinion of the trial judge there was evidence which if believed would support the theory of conspiracy was, we think necessarily prejudicial to the appellant, and, in our judgment, the appellant's timely objection to that phase of the charge should have been sustained, and the theory of conspiracy eliminated. The failure to do so, we think, entitled the appellant to a new trial.

The judgment is accordingly reversed and the cause remanded.

*Reversed and remanded.*